W. SHARP, J.,
dissenting.
I respectfully dissent. In my view, Tortoise Island Communities, Inc. v. Moorings Ass’n, Inc., 489 So.2d 22 (Fla.1986) does not require an affirmance of this case. Indeed, the dissenting opinion written by Judge Cowart,[1] which the Florida Supreme Court adopted “as our own,” supports the establishment of an easement in this case. Accordingly, I would reverse.
The key facts in this case were not substantially in dispute. In order to apply the principles referenced in the Tortoise Island case to this, it is necessary to set them out in some detail. Although it is not drawn to accurate scale, the parties agreed at trial that the following sketch accurately depicts the property at issue:
[[Image here]]
The whole of the property shown on the sketch is Lot 12 of the Lake of the Woods Subdivision, in Seminole County, Florida. Highway 17-92 runs along the west end of the lot; a span of 80 feet. The east end of Lot 12 borders on a lake and has approximately 229 feet of lake frontage. It is a long, relatively narrow lot, comprised of approximately five acres.
L.L. Werley and his wife and her parents, purchased the lot in 1945 or 1946, when that part of the county was still rural in character. There was a dirt road (approximately 15 feet wide) that ran down the middle of the lot to the lake, depicted on the sketch as “F.” It was used by the general public to gain access to the lake for fishing and swimming. The road “meandered” more in “those days,” but it is roughly today in its original location. It is now paved.
In 1946 or 1947, Werley built a two-story building on parcel “A” where he and his wife lived and he had a business. It was accessed from 17-92. At the same time, he also built a shop on the back part of parcel “A,” which was used by his father-in-law for his business of lawn mower sales and service. Both buildings are still on parcel “A,” although enlarged and remodeled. The shop building fronted not on 17-92, but on “F” and partially encroached on “F.” The shop building was constructed with doors for ingress and egress onto “F.” The mailbox for that building was always on “F.” Since 1948, each successive owner of “A,” or tenant, *1252 has used “F” to access the rear portion of “A.”
In 1948, Werley sold parcel “E” to Dickson. It did not include “F.” Dickson likewise used “F” to access his parcel. “E” was transferred to other owners, who also used “F.” In 1986, Kavanagh, the defendant and appellee in this case, obtained title to “E,” following a mortgage foreclosure.
In 1959, Werley’s widowed mother-in-law conveyed her remaining half-interest in Lot 12, to Werley and his wife — shown on the sketch as “F, B, C, DI and D2.” The reason for the transfer was to cany out the terms of Werley’s father-in-law’s will, and to enable the Werleys to build a home on the lake. The deed expressly provides that it grants to the Werleys a perpetual easement for driveway and ingress and egress purposes over lands described by metes and bounds, which the parties agreed at trial was “F.” Werley testified the easement was necessary to access the property being conveyed to him, which he partially owned already, but that at all times he intended and expected all of the owners of properties bordering on “F,” would have the right of access over “F,” for ingress and egress.
In 1969, Werley sold parcel “A” to Hill and Cummings. They used “F” continuously to access the shop’s garage doors, which faced “F” on the rear of “A.” In 1972, Hill and Cummings leased “A” to Martin, the plaintiff and appellant in this case. In 1977, Hill and Cummings (together with their spouses) sold “A” to Martin.
In 1978, the then-owner of parcel “E” paved “F” all the way to the lake, with the agreement and consent of Werley and Martin. Martin thereafter assisted in repairing, resealing and landscaping the paved driveway on “F.” It has been paved and used for more than twenty years by the various owners of parcels “E,” “A,” “B,” “C,” and “D.”
In 1980, Martin and his wife purchased parcel “B” from Werley.[2] At the time it was vacant land. In 1982, Martin built an addition onto the shop and additional buildings on parcel “B.” To access parcel “B,” Martin built a large gate onto parcel “F” sufficient to give access to the large equipment which his business serviced.
Based on the current configuration of the buildings on parcels “A” and “B,” Martin cannot get large tractors and equipment serviced by his business across “A,” but must access “B” through “F.” From “A” it is possible to walk to “B,” or drive in a car in a round-about way. However, because of the size of the equipment being serviced by the business on the premises, and the configuration of the buildings on “B” and other improvements (retainage pond and fuel storage containers), “F” is the only practical access to “B.”
In 1984, Martin and his wife purchased parcel “C” from Werley and his wife. It also was vacant land. Martin continuously accessed that parcel from “F,” with Wer-ley’s understanding and agreement that he had a right to do so. In 1986, Martin purchased a metal building from Kav-anagh, which had been located on parcel “E,” and moved it to parcel “C,” for use as a warehouse. It covers all of parcel “C” as well as part of parcel “B.” Because of the configuration of the buildings and the narrowness of the parcels, access to that building on parcel “C” for large trucks, is limited to “F.” In order to access “C” via “A” and “B” to 17-92, Martin would have to tear down a building on “B.”
In 1988, Werley and his wife sold the remaining part of Lot 12 which they then owned, to Kavanagh — shown on the sketch as “DI”, “D2” and “F.” Kavanagh also executed a mortgage deed to the Werleys, which described “F,” and said it was “reserved for a perpetual easement for drive *1253 way and ingress and egress” to “Dl” and “D2.”
At the time of this lawsuit, Martin had conveyed his interest in parcels “A,” “B,” and “C” to a partnership, owned and controlled by himself and his son, who was then managing the business. The parties stipulated that there had been no equitable transfer of ownership, and that legal title was so held for estate planning and business reasons only. The use of “F” for access purposes to “A,” “B” and “C” continued as described above, until 1996, when Kavanagh blocked access to “B” and “C” from “F,” and this lawsuit ensued in 1997.
The trial court concluded that Martin had failed to establish an easement over “F” for the benefit of his parcels “B” and “C,” because they were contiguous to one another and to “A,” which he owned, and which had access to 17-92. He could reach “B” and “C” by driving around, over or under the buildings on “A” and “B.” Thus, “B” and “C” were not “land locked,” however difficult it-was to access them from “A.”
This case was pled primarily as an effort to establish an implied easement by grant or reservation, but evidence concerning how it may have arisen due to prescriptive use was also presented. In my view, the evidence was clear and virtually undisputed, that at least as to parcel “A,” the easement over “F” to reach “A” was established by prescriptive rights.
In order to establish a prescriptive easement, the claimant must prove:
(1) actual, continuous, uninterrupted use by the claimant for the full prescriptive period, which is 20 years;
(2) that the use is adverse under claim of right, and either with the actual knowledge of the owner or so open, notorious and visible that knowledge of the use is imputed to the owner;
(3) that such use be inconsistent with the owner’s use and enjoyment of his land and must not be a permissive use; and
(4)that such use be related to a certain limited and defined area of land, or if for a right-of-way, the use be of a definite route with a reasonably certain line, width, and termini.
Downing v. Bird, 100 So.2d 57 (Fla.1958); Suwannee River Water Management Dist. v. Price, 740 So.2d 46 (Fla. 1st DCA), rev. denied, 741 So.2d 1136 (Fla.1999); Brewer v. Flankey, 660 So.2d 761 (Fla. 5th DCA 1995); Supal v. Miller, 455 So.2d 593 (Fla. 5th DCA 1984); Gay Bros. Const. Co. v. Florida Power & Light Co., 427 So.2d 318 (Fla. 5th DCA 1983).
With regard to (1), the evidence established that Martin, and Smith and Cummings utilized “F” to access the back part of parcel “A” since 1969- — more than a twenty-year span. With regard to (2), the use was open and notorious. It has been utilized by Martin since 1972, as a matter of right. His right to use “F” was also acknowledged by Werley, the owner of “F” until 1988. Martin’s use of the easement was also not challenged or objected to by Kavanagh, after he purchased “F” in 1988, through the commencement of this lawsuit. Nor did Martin ever ask Kavanagh’s or Werley’s permission to use “F.” With regard to (3), Martin’s use of “F” for access ■with heavy equipment was also inconsistent with Werley’s use of “F” as an exclusive driveway to his residence, which had been built on D2, in 1960. And, in regard to (4), the easement — a fifteen-foot roadway depicted on the sketch — is clearly sufficiently defined to be a definite route with a reasonably certain line, width and termini.
With regard to parcels “B” and “C,” in my view, Martin acquired an implied grant of an easement over “F” for both parcels, from the undisputed facts established in this case. Implied and reserved easements which arise from “quasi-easements” are a well-accepted and established method of proving an easement at common law, in this country. Such an easement arises when the owner of real property uses a portion of that property to benefit another *1254 part of the property in such a dedicated way that it becomes a “quasi-easement” over the used part (the servient estate), in favor of the part served (the dominant estate). No actual easement arises at that point because the ownership of the fee is in one person or entity. But when the owner conveys part of the property to another, the law implies that the parties intended the easement was either granted (if the dominant estate is sold) or reserved (if the servient estate is sold). The law’s recognition of the creation of such an easement is based on the implied intent of the parties. See Arthur Gaudio, The American Law of Real Property § 6.02[5](b) (1994); 11 Thompson on Real Property § 351 (1980).
In order to prove the establishment of such an easement, the claimant must prove three things:
(1) that the dominant and servient estates were once united in a single ownership;
(2) that prior to severance, the common owner used part of the land as a quasi-servient estate, and part as a quasi-dominant estate. The use of the claimed easement (in this case a road easement for ingress and egress) must have been apparent and continuous, over part of the property to benefit another part. Its use must be regular, rather than casual and temporary;
(3) the easement must have been necessary for the beneficial use of the dominant parcel. But the degree of necessity needed to establish this prong, traditionally, was not “strict” necessity, which virtually requires the land be landlocked and totally inaccessible, as is required to establish an easement by necessity.
11 Thompson on Real Property § 353 (1980).
This third element of an implied easement, in my view, has been misinterpreted in this case, based on the trial judge’s understanding of the Tortoise Island case. As one authority pointed out, the Florida Supreme Court simply adopted Judge Co-wart’s dissenting opinion, without any discussion or explanation, and thus it is somewhat unclear what was meant.[3] It appears most logical that both the Florida Supreme Court and Judge Cowart viewed the facts in Tortoise Island as an easement of necessity case, but did not reject the well-established body of law concerning implied and reserved easements. Had they done so, they would have collapsed a well-established body of common law, and folded it into the concept of easements by necessity — which is quite a different breed of cat. See 11 Thompson on Real Property § 352 (1980).
Indeed, in his dissenting opinion, Judge Cowart explained that the underlying bases for implied easements and easements by necessity are different. One is based on an actual promise and the other by operation of law, from the facts and lack of an actual promise. An easement of necessity arises not because of the parties’ presumed implied intent and prior use and, in fact, arises without any regard for intent or prior use. It is primarily a public policy determination that land sold should not be allowed to become useless because the owner, has no access to it. It is for that kind of easement that strict necessity must be found.
Judge Cowart also wrote in Tortoise Island that an easement by implication other than an easement by necessity also exists. He stressed that kind of easement cannot arise from facts independent of a writing and that an oral express promise to convey an easement is insufficient to create such an easement because of the Statute of Frauds.[4] Because no written *1255 document or deed sufficient to pass title was involved in Tortoise Island, that kind of implied easement was not presented by the facts in that case. Judge Cowart stated:
We are not here involved with the distinctly different question as to whether an existing easement appurtenant to a dominant estate is conveyed by implication by the deed conveying the dominant estate under the doctrine that the easement appurtenant ‘runs with the land.’
Moorings Association, 460 So.2d at 969, n. 3.
In this case, the record established that Lot 12 was originally owned by Werley and his wife, and her parents. Parcel “E” and parcel “A” were sold off first. In 1959, Werley’s widowed mother-in-law conveyed her one-half interest to Werley and his wife, in the balance of Lot 12, creating the necessary unity of title. In that deed, she also conveyed to Werley and his wife, a perpetual easement for driveway and ingress and egress over “F.” It is not clear from the record that she ever conveyed her one-half interest in the fee to “F” as well. The balance of the property she conveyed to Werley and his wife included “B” and “C” as part of the dominant tenement. Thus, the requirement of a writing sufficient to satisfy the Statute of Frauds existed in this case.
When Werley and his wife later conveyed parcels “B” and “C” to Martin, without referencing the easement, because they were part of the dominant tenement, a grant of the access easement should be implied because it was appurtenant to all parts of the dominant tenement described in the 1959 deed, including parcels “B” and “C.” It ran with the land.
The other elements of an implied grant of an easement were also satisfied in this case. Use of “F” as a driveway and access to the parts of Lot 12 behind parcel “A,” including parcels “B” and “C,” had been well-established since the 1960’s. It was clearly marked and later paved, and had the appearance of permanency. The original owner of the dominant tenement testified that he intended that subsequent owners of the parcels he conveyed on either side of “F,” would have the right to use the easement. Martin testified he assumed he had the right to use the easement, and did so over a long period of time. Sufficient testimony established that although parcels “B” and “C” were not land-locked in the sense they could not be accessed via parcel “A,” as a practical mater, due to the narrowness of Lot 12, and the configuration of buildings on parcels “A,” “B,” and “C,” built in reliance on “F” as the access point, use of “F” was required in order to make practical beneficial usage of parcels “B” and “C.”
I would reverse and remand to establish the easement rights of Martin.

. Moorings Association, Inc. v. Tortoise Island Communities, Inc., 460 So.2d 961, 966 (Fla. 5th DCA 1984) (Cowart, J., dissenting).

. The grantors on the deed were Werley and his wife, and John Andrews and his wife, apparently relatives or heirs of Werley’s in-laws, the Conleys.

. Jon Bruce and James Ely, Law of Easements and Licenses in Land, PP. 4-56, n. 118 (Rev. Ed.).

. But see Jon Bruce and James Ely, Law of Easements and Licenses in Land, Ch. 4 (1995).